IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | No. C 10-00022 WHA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND FINDINGS IN SUPPORT OF PRELIMINARY INJUNCTION** |
| INC21.COM CORPORATION, *et al.*, | |
| Defendants. | |

**INTRODUCTION**

In this enforcement action, the Federal Trade Commission moves for the entry of a preliminary injunction to stop defendants from collecting unauthorized charges on many thousands of telephone bills. For the reasons set forth below, a preliminary injunction is warranted and is now **GRANTED**.

**STATEMENT**

This action highlights the vulnerable underbelly of a widespread and under-regulated practice called LEC billing. LEC billing — or "Local Exchange Carrier" billing — arose out of the court-ordered break-up of AT&T in the 1980s. *See United States v. American Tel. & Telegraph Co.*, 552 F.Supp. 131, 227 (D.D.C. 1982). After AT&T agreed to divest its local phone operations into seven independent regional holding companies, the local phone companies continued to present customers with the convenience of a *single* telephone bill for both local and

long-distance fees, despite the fact that the long-distance services were provided by separate business entities. LEC billing was born. Four years later, the FCC detariffed the billing and collection services provided by local telephone companies, opening the door for LEC billing to be used as a method of charging and collecting payments for a wide variety of services. *See In the Matter of Detariffing Billing and Collection Services*, 102 F.C.C.2d 1150 (1986). Today, the types of charges that can appear on local telephone bills through LEC billing encompass far more than long-distance services and can have almost nothing to do with phone services.

Since its institution, LEC billing has attracted fraudsters. *See, e.g.*, *In the Matter of Truth-in-Billing and Billing Format*, 14 F.C.C.R. 7492 (1999) (discussing rampant fraud in the LEC billing industry). In response to escalating consumer complaints regarding the placement of unauthorized charges on their phone bills — a practice known as "cramming" — the FCC responded in the late 1990s by adopting principles and guidelines to help consumers understand their phone bills and to deter this fraudulent practice. Of course, the approach taken by the FCC was (and remains today) premised on the dubious assumption that consumers scrutinize their phone bills every month before paying them, and local phone companies are vigilant about allowing only *authorized* third-party charges to appear on their phone bills. *See In the Matter of Consumer Information and Disclosure,* 24 F.C.C.R. 11380 (2009). Fraudsters can easily exploit this dubious assumption.

### 1. ABOUT INC21

Defendant Inc21[1] is a San Francisco company that claims to provide three types of online services to consumers: (1) Internet-based business directories and yellow pages; (2) search engine marketing; and (3) online faxing services (J. Lin. TRO Decl. ¶ 2).[2] With the exception of a limited number of customers that use Inc21's "GoFaxer" product, all of Inc21's customers are charged on their telephone bills using LEC billing (*id.* ¶ 2). Assuming for the sake of argument that these products and services have some substance, the FTC contends that the vast majority of

---

[1] For the sake of convenience and simplicity, all defendants are collectelly referred to in this order as Inc21.

[2] Declarations denoted with "TRO" were filed in conjunction with briefing pertaining to the temporary restraining order granted by the undersigned on January 19, 2010.

2

Inc21's customers never authorized anyone to bill them, much less bill them via hard-to-find charges on their monthly phone bills.

To promote and sell its MetroYP, GlobalYP, NetOpus, and JumPage products and services, Inc21 allegedly contracts with brokers and call centers around the world, including in the Phillipines, India, and Canada (*id.* ¶ 13). Inc21's pays these entities a commission for each valid sale they procure (*id.* ¶ 14, Exh. A). The foreign call centers are purportedly provided with training manuals, including sales scripts that are approved by the LEC, *i.e.* the local phone company whose bills are used to collect Inc21's monthly service charges, and the billing aggregator, a "middle man" company that aggregates and manages billing requests and payments between the LEC and companies like Inc21 (*id.* ¶ 19, Exh. F). To supposedly ensure, however, that foreign brokers and call centers do not fabricate sales to earn their commissions, Inc21 says that it uses what are called third-party verification ("TPV") services, described below (*id.* ¶ 17, Exh. D).

Sales of Inc21 products and services are allegedly consummated in the following manner: Inc21 maintains a listing of North American businesses, and purportedly filters that list to eliminate government agencies, schools, banks, and franchises (*id.* ¶ 20). Next, any business listed on the "Do Not Call" registry are removed. What remains, in theory, are only those businesses that Inc21 deems as "potential customers" (*ibid.*). The overseas call centers then "cold call" these leads, supposedly following a detailed procedure to determine whether the potential customer is interested in Inc21's services (Dkt. No. 18 at 8–9; J. Lin TRO Decl. ¶¶ 21–22). Once a callee indicates that he or she is interested, the TPV service is brought into the phone call and verifies the sale by asking a series of preset questions that are also approved by the LEC and billing aggregator (J. Lin TRO Decl. ¶ 23, Exh. G). The TPV segment is purportedly recorded. As explained at the hearing, however, the entire sales conversation is *not* recorded. Only the last portion of the conversation, where the customer purportedly agrees to receive Inc21's services, is supposedly recorded. Once the sale is completed, the TPV and telemarketer upload, in digital format, the information pertaining to the sale for Inc21's review (*id.* ¶ 24). Each sale is "inspected" by Inc21's own employees, it says, before an account is created to ensure that the sale

3

is valid (*ibid.*). If a sale passes inspection, the customer is mailed a welcome letter that congratulates him for signing up and warns the customer that he has 15 days from the sign-up date to cancel the service, else he will be charged a monthly fee of around $34.99 (*id.* ¶ 25, Exh. H). The customer is also purportedly informed that cancellation requests are "immediate" and "will incur no penalty charges" (*ibid.*). Finally, Inc21 waits 20 days before instituting monthly billing, which appears on the customer's phone bill (*id.* ¶ 27). These safeguards and procedures — including the telemarketing manual, the lead filtering, the TPV service, Inc21's own inspection of each sale, and the welcome letter — were and are meant to protect customers from being billed for services they did not authorize. The foregoing, of course, is Inc21's version of the facts.

### 2. A HISTORY OF FRAUDULENT ACTIVITY

The evidence, however, tells a different story — namely, that the vast majority of "customers" *never* authorized any charges or bought any services, and yet are being "ripped off" by surreptitious add-ons to their phone bills by LECs, which is then funneled to Inc21. It is worthwhile to recount the strange procedural history preceding this litigation. Before the FTC filed this action, Inc21 filed its own action before the undersigned judge against its foreign call centers alleging massive fraud pertaining to the telemarketing of its products and services (Case No. 3:08-cv-02967-WHA). In that litigation filed in June 2008, which ended in the entry of default judgment, Inc21 asserted that its call centers in the Phillipines had fraudulently signed up *thousands* of customers by "using recorded or digitized answers" to "thwart the TPV verification of sales" (Wolfe Decl. Att. G; J. Lin Dep. 166:18–171:10). This is the same call center allegedly responsible for over 30,000 "sales" of Inc21 products and services. On April 27, 2009, Inc21 *again* filed suit against yet more of its own agents — this time, a company called "Delicate Data" that was contracted to acquire 100,000 "authorized" customer sign-ups for Inc21 — alleging fraudulent sales of its products (Case No. 3:09-cv-01824-WHA). In this second action, Inc21 alleged that of the 78,071 customers signed up by Delicate Data, approximately 70% were fraudulently procured. This second action was stayed, however, due to a criminal investigation of Inc21 and its principals.

4

Related to this criminal investigation, on June 9, 2009, postal inspectors and IRS agents executed search and seizure warrants on Inc21 and its principals based upon an investigation conducted by Postal Inspector Andrew Wong (Opp. 1). This seizure gave rise to yet a *third* proceeding — a civil forfeiture action also before the undersigned — in which Inc21 was (and still is) a claimant (Case No. 3:09-cv-03119-WHA). Like Inc21's second civil action mentioned above, this forfeiture action was stayed due to the criminal investigation of Inc21 and its principals.

### 3. THE INSTANT ACTION

On January 5, 2010, the FTC commenced the instant action and obtained a temporary restraining order (Dkt. Nos. 1, 5). The TRO motion relied heavily upon the same affidavit of Postal Inspector Wong that formed the basis of the search and seizure warrant. An expedited briefing schedule was set, allowing Inc21 a fair but prompt opportunity to rebut the allegations and evidence presented by the FTC. Following a hearing on the temporary restraining order on January 14, the FTC's motion was granted in part and a hearing on the instant motion was scheduled for February 11 (Dkt. No. 28). To ensure that both parties had the opportunity to substantiate their respective claims in preparation for the preliminary injunction hearing, an expedited discovery schedule was set that allowed Inc21 to inspect all documents relied upon by Postal Inspector Wong in preparing his affidavit (Dkt. No. 27). Inc21 was then provided with the opportunity to depose Postal Inspector Wong directly. The FTC, in return, was granted access to Inc21's current customer list as well as depositions of Inc21's principals, brothers John and Roy Lin, who waived the Fifth Amendment.

Importantly, at the January 14 hearing, the undersigned requested certain evidence for the preliminary injunction hearing. The FTC was ordered to procure at least twelve *new* sworn declarations of current or former Inc21 customers who had been billed without authorization for Inc21's services (*id.* at 37).[3] This request was made in response to Inc21's adamant assertions at

---

[3] At the time the Court ruled on the temporary restraining order, the FTC had only submitted two declarations from allegedly defrauded customers.

5

the January 14 hearing that it ran a legitimate business, that thousands of customers relied upon its products and services, and that the Wong Affidavit was factually inaccurate.

For its part, Inc21 was ordered to send *all* of its current customers a verification letter asking them to confirm in writing that they authorized their services and wanted to continue being billed via LEC billing (*id.* at 32). With respect to the verification letter, the Court stated (*id.* at 32, 36–37):

> THE COURT: All right. Now, here is some possible relief for Inc21, who is already set up to send out the welcome package, and use that same procedure to send out a letter to the customers that says something like the following:
>
> "The Judge has ordered us to send this out. And we need for you to confirm that you, indeed, do want to continue to get this service and that you, in fact, did authorize it to be deducted from or added to your phone bill. And please sign in ink your name," you know, something that will be — you two [parties] work out the form.
>
> \* \* \*
>
> THE COURT: . . . It should be a simple form. . . . One page, simple. They can just say: "We do authorize this. This is a legitimate product. We authorize this." Then, those, as to those people, we're going to let the money start flowing again.
>
> \* \* \*
>
> THE COURT: . . . I'll be asking you [at the preliminary injunction hearing]: "How many customers have signed up for this directly?"
>
> You know, for example, if you came in here and there were thousands of customers saying: "Please, this is a great product. Please, we want this on our phone bill," and there are a lot of those, I will just vacate the TRO.
>
> MR. GROSS: Okay.
>
> THE COURT: On the other hand, if there are very few who have said that, it's going to be something of an indicator that something fishy is going on here.

Pursuant to this instruction, Inc21 sent its current customers a verification letter as follows (Dkt. No. 29):

> Dear Customer,
>
> To ensure your satisfaction and that you continue to receive [Inc21's] service, please complete and sign the verification form below and return it to us in the enclosed, self-addressed stamped envelope. For these services, you are currently being billed

6

[$XX.XX] monthly on your telephone bill. Unless we receive the
attached form, your service may be discontinued.

The letter then presented the reader with three check boxes, stating: (1) I previously authorized [Inc21] to provide services to me and to bill me on my telephone bill, (2) I authorize [Inc21] to continue billing me on my telephone bill, and (3) I prefer that [Inc21] bill me via invoice. After reminding the customer *again* that their service may be discontinued if they did not return the form, the letter then stated the customer's name, address, and phone number on record, as well as a signature line for the customer to sign (*ibid.*).

Significantly, the returns show that only a small percentage of Inc21's customers wish to continue paying for or receiving defendants' services.

### 4. EVIDENCE FROM EXPEDITED DISCOVERY

With respect to the 10,924 customer verification letters mailed by Inc21 to its existing customers, only 27 customers — or 0.25% of Inc21's customer base — returned a response indicating that they expressly authorized Inc21's charges and wanted to keep their services as of the date of this order.[4] By contrast, 71 customers responded to the letter asking Inc21 to cancel their services *immediately*. Of these 71 responses, 37 customers clearly stated that they were being billed by Inc21 without authorization (Dkt. No. 47, Exh. A; Dkt. No. 55). The many thousands who did not respond should be deemed to reject the service, since the letters expressly stated that a failure to respond might lead to a discontinuation of their service.

Additionally, the FTC produced not just 12 but *36 new* sworn declarations from customers — supplementing the two that had been previously submitted in support of the TRO — showing that consumers had been recently charged, without authorization, for Inc21's products and services. Of these former Inc21 customers:

---

[4] A handful of these customers, however, indicated that they preferred to be billed via invoice rather than through LEC billing. Additionally, nine customers either returned the letter unsigned or signed the letter without checking any of the three options. These nine responses are not included in any of these totals, since it is unclear what the customer intended by signing the form.

7

- Nine were falsely told that the initial telemarketing call was meant only to update their Yellow Pages listings or confirm their business information.[5]
- Nine were never fully refunded for unauthorized charges after they had cancelled.[6]
- Three reported that Inc21 telemarketers tried to badger them into accepting the service or saying the answer "yes" to a question even if the true answer was "no."[7]
- Four reported that the person named by Inc21 as "having authorized the charges" on their telephone bills was a non-existent person or a person who had not lived at the residence for over 15 years.[8]
- Five reported that the person named by Inc21 as having authorized the charges was a person that had no authority to authorize such charges and did *not* authorize such charges.[9]
- Eight reported, after listening to the TPV recording of their "authorization" of Inc21 services, that the recording did not accurately reflect the conversation that occurred and appeared falsified.[10]

---

[5] *See* Decls. of Cronk, Fogel, Gerber, Gold, Groppe, Koval, Machen, Sommerfeld, and Weber.

[6] *See* Decls. of Abbate, Benedict, Cronk, Gerber, Gold, Kaylor, Morris-Meyer, Urso, and Witt.

[7] *See* Decls. of Brown, Bryan, and Rumphol. As explained at various points in this order, entire sales conversations were *never* recorded by Inc21 or its agents. Only the portion of a sales call where a customer purportedly "agreed" to authorize services was recorded for TPV purposes. Given the clear history of fraud in Inc21's sales process and these particular declarations, it is clear that Inc21's TPV recordings cannot be trusted. The customer may be saying "yes" when, in fact, they were instructed *prior to when TPV recording started* to answer in a particular fashion. Indeed, they could have been promised, prior to when TPV recording started, that they would *not* be charged for the service.

[8] *See* Decls. of Abbate, Cillian, Davis, and Groppe.

[9] *See* Decls. of Knight, Morris-Meyer, Sommerfeld, Urso, and Weber.

[10] *See* Decls. of Gold, Hartig, Koval, Morris-Meyer, Smerud, Weber, Winn, and Witt.

8

1  •  Fourteen reported that they could not reach Inc21 to lodge complaints about the unauthorized billing or request cancellation of services and a refund.[11]

•  Two reported that they would never have authorized the services because they ran national franchises and had no need for them.[12]

•  Eleven were billed for *multiple months* for charges they never authorized in the first place.[13]

The FTC also had the opportunity to depose the principals of Inc21, Roy and John Lin. These depositions revealed that both Roy and John Lin signed sworn, materially false statements in order to gain access to the LEC billing system for their MetroYP, GlobalYP, JumPage, and GlobalypUSA products and services (R. Lin Dep. 329–45, 346-53, Atts. L and N; J. Lin Dep. 122–24, 242-63, Att. K). Specifically, the principals of Inc21 failed to disclose in their LEC billing applications that the above-named products and services were interrelated and shared a common owner.[14] Additionally, the applications failed to mention that various complaints had been lodged against Inc21 for its LEC billing practices in the past (R. Lin Dep. 353–62).

It is also clear that the principals of Inc21 were well aware of widespread fraud and complaints against their various companies. Verizon terminated MetroYP's LEC billing in July 2005 for excessive unauthorized charges, and then terminated JumPage's LEC Billing in May 2009 for excessive unauthorized charges (J. Lin Dep. 185–89, 191–92, Att. H). Additionally, BSG, a payment processing company, demanded in November 2006 that Roy Lin listen to TPVs for MetroYP's *entire* customer base due to "questionable job titles" of the individuals who had "approved" their services (R. Lin Dep. 216–27, Att. J).

---

[11] *See* Decls. of Abbate, Bloom, Brown, Bryan, Buesing, Cronk, Gerber, Groppe, Hammond, Maklari, O'Neil, Rumphol, Smerud, and Thompson.

[12] *See* Decls. of Urso and Weber.

[13] *See* Decls. of Benedict, Buesing, Fontana, Hammond, Kaylor, Lapinski, Morris-Meyer, O'Neil, Thompson, Urso, and Witt.

[14] The depositions also revealed that the Lin brothers had their mother and father sign various forms for Inc21, even though the parents had no involvement in the operation of the business (R. Lin Dep. 110–111, 353–62; Wolfe Decl. Att. O). Even after their mother had passed away, her signature appeared on a sworn filing (J. Lin Dep. 148–149).

9

Finally, a review of Inc21's current customer list — at least at the time of the TRO — revealed that public schools, franchises, and banks were being billed for Inc21 services. These customers included Starbucks, Enterprise Rent-a-Car, Ralph's Grocery Store, Blockbuster Video, McDonald's, Sears, Wells Fargo, Los Banos High School, and Miano Elementary School (J. Lin Dep 130–38, Att. E). This is inconsistent with John Lin's sworn declaration describing the sales process followed by Inc21 and the "filtering" done to ensure public schools, franchises, and banks were not cold called.

Inc21 submitted its own evidence in opposition to the FTC's motion for a preliminary injunction, based upon its deposition of Postal Inspector Wong and the documents he relied upon to prepare his affidavit. Inc21 also provided an independent analysis of its own sales data that was *not* ordered by the Court.

The deposition of Postal Inspector Wong revealed that numerous telephone interviews had been conducted by Wong prior to submitting his affidavit. These interviews indicated that a handful of Inc21 customers had actually authorized various services provided by Inc21 (Gross Decl. ¶ 4, Exhs. 3–9). Similarly, Postal Inspector Wong's investigation file included evidence that the Public Utility Commission of Texas twice determined after investigating complaints that Inc21 charges had been authorized by two customers (Wong Dep. 144–145, Exh. 10).

Inc21 points to Postal Inspector Wong's knowledge of these authorized customers as being inconsistent with Wong's repeated assertions in his affidavit and at his deposition that he did not identify *a single consumer* in his investigation who authorized charges by Inc21 (*see, e.g.*, *id*. 67–70, 72, 74–76; Wong Affidavit). Wong's explanation for these inconsistencies was that he either was mistaken when filling out the above questionnaires, or simply forgot about them when he prepared the affidavit (Wong Dep. 100, 118). Similarly, Postal Inspector Wong disclaimed any recollection of the Texas PUC documents (*id.* 145).

Most notable of Inc21's "evidence" is a re-examination conducted by Quality Calls, Inc., an independent and allegedly reputable TPV company, that reviewed the TPV sales data of Inc21s's current LEC billing customers (Josey Decl. ¶ 3). Specifically, QCI — at the recent direction of Inc21 — was asked to re-examine 10,484 TPV recordings for Inc21 customers. Of

10

these TPV recordings, 4,989 "passed" QCI's re-examination and 5,445 "failed" (*id.* ¶ 5). This translates to a 48% pass rate *and a 52% failure rate.* Thus, by defendants' own evidence, 52% of their customer base should never have been billed.[15]

### 5. RELATED PRE-HEARING FILINGS

Leading up to the preliminary injunction hearing, both sides submitted timely briefs and supporting declarations. Inc21 also provided the Court with supplemental updates of customer verification responses. During the briefing process, Inc21 filed a separate motion in the related civil forfeiture case petitioning the undersigned to release approximately $750,000 in seized funds to pay for its legal fees. Inc21 also asked the Court to set an early trial date in March 2010 for both the forfeiture and instant action. Both requests were denied (Dkt. No. 30). The undersigned, however, sought comment from the parties in both the civil forfeiture action and the instant action as to whether they should be consolidated and scheduled for an early trial (*ibid.*).

Pacific Bell also appeared in this action, seeking relief from any injunction that may issue as a result of this motion. Finally, on the last business day before the preliminary injunction hearing, Inc21 filed a motion to compel the production of any and all *drafts* prepared by Postal Inspector Andrew Wong in the creation of his affidavit.

A hearing on this motion was held on February 16, 2010. In addition to the parties in the instant action, counsel for the government in the related civil forfeiture action, counsel for Pacific Bell, and counsel for The Billing Resource (a billing aggregator for Inc21) appeared before the undersigned.[16] This order reflects a thorough examination of all documents filed with the Court, and all arguments set forth at the hearing.

---

[15] According to QCI, a TPV will only "pass" if (1) the customer provides all information when prompted; (2) the responses are clear and understandable; (3) the person giving the answers is actually the customer; (4) the voice answering the questions is the same throughout the recording; (5) the voice is not computer-generated; (6) the audio has no sign of being tampered with. If any of the six criteria do not pass, the sale will "fail" (Josey Decl. ¶ 4). Additionally, the discrepancy between the number of TPV records (10,484) and actual Inc21 customers (9,082) is apparently due to the fact that certain customers had multiple TPV entries. The reason for this is not explained (Dkt. No. 47 ¶ 6).

[16] Although Pacific Bell, The Billing Resource, and all other local exchange carriers and billing aggregators involved in the billing and collection of charges on behalf of Inc21 have *not* been named as relief defendants, this order and the accompanying preliminary injunction treat them as such.

11

**ANALYSIS**

Section 13(b) of the Federal Trade Communications Act, 15 U.S.C. 53(b), states:

> Whenever the Commission has reason to believe . . . (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and (2) that the enjoining thereof . . . would be in the interest of the public . . . the Commission . . . may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond.

As such, to meet its burden for issuance of a preliminary injunction under the FTC Act, the FTC need only show a likelihood of success on the merits and that the balance of equities weighs in favor of an injunction. *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989); *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1233 (9th Cir. 1999) (the FTC need *not* show irreparable harm for a preliminary injunction to issue).[17] "Because irreparable injury must be presumed in a statutory enforcement action, the district court need only to find some chance of probable success on the merits." *World Wide Factors*, 882 F.2d at 347.

The complaint alleges (1) deceptive business practices, (2) unfair billing practices, and (3) violations of the FTC's Telemarketing Sales Rule (Compl. ¶¶ 28–29, 31–33, 46–51). These allegations are now addressed in turn.

**1. VIOLATIONS OF SECTION 5 OF THE FTC ACT**

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. 45(a). To prove deception, the FTC must show (1) "there is a representation, omission, or practice" that (2) "is likely to mislead consumers acting reasonably

---

[17] Congress intended this standard to depart from the "traditional" equity standard for issuing an injunction, which required the consideration of irreparable harm. *See* H.R.Rep. No. 93-624, at 31 (1971). Congress determined that the traditional standard was *not* "appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief." *Ibid*. In this light, the recent Supreme Court holding in *Winter v. Natural Resources Defense Council*, — U.S. —, 129 S.Ct. 365, 374 (2008), which clarified the test for applying the "traditional" equity standard for issuing an injunction does *not* affect the analysis under Section 13(b) of the FTC Act. Moreover, the parties do not dispute this standard.

12

under the circumstances" and (3) " the representation, omission, or practice is material." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).

Here, this order finds that the FTC has met its burden of showing a likelihood of success on the merits. Six compelling bodies of evidence support this finding.

*First,* after mailing 10,924 customer verification forms to all of its currently billed customers, only 27 have thus far responded indicating that they expressly authorized Inc21 to bill them for their services and wanted to continue receiving such services. By contrast, although not required to do so, 71 customers filled out the form and cancelled their services with Inc21. Of these customers, more than half indicated that they had *not* authorized being billed in the first place, with the majority demanding refunds. Significantly, the customer verification letter — as it was worded by Inc21 — placed the onus *on the customer* to fill out, sign, and return the form to continue receiving their services. Indeed, despite being warned *twice* in the letter that their "service may be discontinued" if they did not sign and return the form, only 27 out of nearly 10,000 customers have thus far come forward to *prevent* their services from being cancelled. The silence of the remaining thousands — given this express warning — indicates these customers do not wish to subscribe. This silence speaks volumes.

*Second*, as readily admitted by Inc21 at the hearing on this motion, it was defendants' *own* actions in contracting with foreign call centers in the Phillippines and an unscrupulous TPV service provider that set in motion the fraudulent billing of *thousands* of Inc21 customers. As stated, Inc21 itself filed two separate lawsuits against these third-party entities alleging — and thereby admitting — that these agents of their business fraudulently "doctored" TPV recordings of customers. Given these admissions, Inc21 is not entitled to any presumption that their current customer base has been properly authenticated and has not been tainted by the aftermath of these undisputed fraudulent acts.

*Third*, given the fact that (1) Inc21 has admitted that one of the means of defrauding its customers involved the "doctoring" of TPV recordings, (2) there are numerous sworn declarations by former Inc21 customers stating that their TPV recordings were doctored, and (3) there are numerous sworn declarations by former Inc21 customers stating that they were misled or lied to

13

by Inc21's telemarketers, the self-serving "re-examination" performed by Inc21 of its TPV records fails to persuade the Court that the 4,989 customers who "passed" the re-examination actually authorized their services. On this point, it is important to note that QCI, who allegedly performed this "re-examination" for Inc21, is the same TPV service provider who previously "passed" the 5,445 TPVs that it now says "failed."[18] Moreover, given the fact that the TPV recordings did *not* capture the entire phone conversation, instead only capturing the end of it where the customer purportedly "authorized" receiving the service or product, the Court — especially given the widespread fraud — cannot assume that unrecorded portions were free from deceit.[19] Finally, Inc21's TPV "re-examination" evidence, without more, illustrates that over 50% of their nearly 10,000 customers that were being billed for Inc21 services *should not have been billed in the first place*. By its own evidence, Inc21 has convicted itself.

*Fourth*, the FTC has produced 36 new declarations — far more than the dozen requested by the undersigned at the January 14 hearing — of consumers who did not sign up for defendants' products and services, but were nevertheless fraudulently billed for them. The sales records for these consumers provide compelling evidence that they were fabricated, and that in many cases the consumers were not even called. Inc21 does not attempt to explain how these consumers, as well as numerous franchises, banks, and public schools, ended up on their current customer list.

*Fifth*, Inc21's customer service logs — which defendants cite to as "proof" of legitimate customers — lack both sufficient detail and credibility to prove that Inc21 has "hundreds" of

---

[18] It is also worth mentioning that the Court has no information on QCI beyond the information provided by Inc21. At the hearing on this motion, counsel for an interested party — who has been working in the LEC industry for over a decade — noted that she never heard of QCI as a TPV service provider.

[19] Pointing out yet another reason why the TPV "re-examination" fails to prove that a sale is "authorized," the FTC notes that the examination of any TPV recording fails to address a critical inquiry: whether the person on the phone is actually the person being billed. Indeed, one of the many declarations produced by the FTC illustrates this deficiency, showing a customer whose TPV recording was "verified" by a TPV service provider, but was actually *not* the customer being billed (*see* Fredrickson Decl.).

14

authorized customers, as argued by defendants.[20] The FTC has submitted compelling discrepancy evidence calling into question whether the entries on these logs accurately reflect the true nature of any of the calls. Specifically, the declaration of Ms. Sharon Pesoat indicates that she did *not* call Inc21 to "correct her business name," as represented in the customer service logs. Rather, Ms. Pesoat called Inc21 to *stop being billed* because she was told during the telemarketing call that there would be no charges (*see* Pesoat Decl.).[21] As a separate matter, the logs fail to prove that any of the customers who supposedly called in for technical support are *still* customers of Inc21.

*Sixth*, while Inc21 spoke at length at the hearing of the procedural safeguards — such as sales scripts — that both John and Roy Lin purportedly have put in place to avoid fraudulent sales of their products and services, the fact that *both* Lin brothers signed LEC billing applications containing materially false information undermines their credibility.

In sum, most to nearly all of Inc21 customers have been charged for services that they did not authorize. Inc21 is and has been engaging in a practice that misleads consumers in a material fashion. Defendants have exploited the fact that most consumers do not carefully read their phone bills or are unaware that their phone bills may include third-party fees to defraud them. The FTC has more than met its burden regarding the likelihood of success on their deceptive practices claim.

\*          \*          \*

In addition to their deceptive practices claim, the FTC also alleged unfair practices in violation of Section 5 of the FTC Act. *See* 15 U.S.C. 45(a) (prohibiting "unfair or deceptive acts

---

[20] The FTC objected at the hearing and in their motion to the admissibility of this customer support log, due to it being attached to the declaration of Inc21's counsel, who does *not* have personal knowledge of the document's authenticity (Dkt. No. 35, Exh. A). The objection is sustained on those grounds. A less-detailed customer support log, however, was properly provided with the declaration of John Lin in Inc21's opposition to the FTC's TRO motion (Dkt. No. 18). This discussion refers to the properly authenticated version of the log.

[21] Ms. Pesoat also states in her declaration that she was called by Inc21 in mid-January 2001. In this phone call, Pesoat claims that the Inc21 representative told her that she had to *sign* the customer verification form in order to "confirm" that she was a customer before Inc21 could cancel her account (Pesoat Decl. Att. A). This casts doubt on the legitimacy of any of the responses "authorizing" Inc21's services. The FTC will presumably investigate this question.

15

or practices in or affecting commerce"). With respect to unfair practices, the FTC must show that defendants' practices (1) cause, or are likely to cause, substantial injury to consumers, (2) the harm is not outweighed by any countervailing benefits to consumers or competition, and (3) the harm is not reasonably avoidable by consumers. 15 U.S.C. 45(n).

For the same reasons as above, the FTC has met its burden of showing success on the merits of this claim. The record supports a finding that Inc21's sales and billing practices failed to adequately safeguard against the unauthorized billing of consumers. Indeed, Inc21's own actions in instituting litigation against its foreign call centers illustrate the deficiencies in its sales and billing systems. Moreover, given the fact that more than half of Inc21's current customers "failed" its internal re-examination, this amounts to a staggering amount of potentially fraudulent charges. Aggregate harm on consumers is sufficient to show substantial injury, and given the fact that many of these defrauded consumers are completely unaware of any services or products they have "purchased," there is *no* benefit to either consumers or competition by these unfair practices. *See FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009). Finally, the FTC has produced sufficient evidence showing that consumers, even after recognizing that they are being charged by Inc21, cannot cancel their services or obtain refunds from defendants despite reasonable efforts.

As such, plaintiff has shown a likelihood of success on the merits for both of their FTC Act claims.

### 2. VIOLATIONS OF THE TELEMARKETING SALES RULE

The FTC's allegations regarding violations of the Telemarketing Sales Rule apply only to "consumer" (rather than "business") sales. *See* 16 C.F.R. 310. On this point, the FTC conceded at the hearing that it did not know how many of Inc21's customers were, in fact, non-business entities. Additionally, the vast majority of the FTC's declarations were from former business customers of Inc21.

Given these uncertainties, this order finds that the FTC has not made a sufficient showing of likelihood of success on the merits of its Telemarketing Sales Rule claims. This finding, however, does not preclude a preliminary injunction as to the FTC Act claims.

**3. PRINCIPAL LIABILITY**

Inc21 makes the audacious argument because "a principal is only liable for the misrepresentations of his agent if he is acting within the scope of the agent's actual or apparent authority," the unauthorized actions of Inc21's foreign call centers should insulate it from liability under the FTC Act (Opp. 8). This argument is rejected. Defendants want to have it both ways. Defendants want to blame their own foreign call centers for the fraud, yet keep on pocketing LEC charges set in motion by the very same fraudsters. Apparent authority is determined from the perspective of the consumer. *See Goodman v. FTC*, 244 F.2d 854, 592 (9th Cir. 1957). The evidence before the Court shows that the foreign call centers represented that they were acting on behalf of Inc21. Additionally, it was Inc21 who orchestrated this overall scheme and set in motion an army of telemarketers who committed fraud. Even if Inc21 did not approve of the fraud (and it seems likely that it *did* approve), the fact remains that Inc21 is responsible for organizing this engine of fraud and reaping its profits. As such, Inc21 may *certainly* be held accountable and the engine of fraud may be shut down by court order.[22]

**4. LIABILITY OF INDIVIDUAL DEFENDANTS FOR INJUNCTIVE RELIEF**

This order finds that the FTC has produced sufficient evidence that both Roy and John Lin participated directly in the practices discussed above, and had the authority to control them. *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). Specifically, the depositions of both brothers indicated that they repeatedly signed sworn documents that contained materially false information, and were aware that unauthorized billing of their customers was prevalent. Since this order has concluded that the FTC has met its burden of showing, under Section 5 of the FTC Act, that Inc21 committed misrepresentations of a kind usually relied upon

---

[22] With respect to relief defendants Pacific Bell (and perhaps other LECs bound by this injunction), the undersigned allowed counsel for Pacific Bell to explain at the preliminary injunction hearing why it was not able to separate out and escrow payments collected on behalf of Inc21. The Court is *not* wholly convinced by this explanation. It seems that Pacific Bell could have organized the LEC billing process — from which it presumably profits handsomely — to have more control over the flow of funds going to potentially fraudulent businesses, but has simply chosen not to do so. This order declines to exempt Pacific Bell and other LECs from the preliminary injunction. LECs have a responsibility to learn the ultimate destination of the funds they are charging their own customers so that if and when fraud occurs, they can protect their customers and immediately put an end to the fraudulent billing.

17

by a reasonably prudent person, thereby causing consumer injury, this is sufficient under *Publishing Clearing House* to warrant a preliminary injunction against individual defendants Roy and John Lin.

### 5. BALANCING OF THE EQUITIES

The public interest in preventing the continued and future fraudulent billing of unaware customers is undeniably great. Moreover, there will be little harm in requiring Inc21 to obtain written customer approval for any further LEC billing.[23] If a customer truly wants the service, then the customer can say so in writing and authorize LEC billing. So far, very few seem to want to service at all. The balancing of equities overwhelmingly favors a preliminary injunction in the form accompanying this order.

As a final comment, it must be reiterated that Inc21 set up this scheme and brought in foreign telemarketers and TPV service providers on their own accord. As such, Inc21 set in motion a process that perpetuated a massive fraud. Even if some of defendants' sales are real, most are undoubtedly phony.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for a preliminary injunction is **GRANTED**. The terms of the preliminary injunction are set forth in a separate and accompanying order. The temporary retraining order previously issued by the undersigned shall expire upon the effectiveness of the preliminary injunction.

**IT IS SO ORDERED.**

Dated: February 19, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[23] On this point, the undersigned expects that Inc21 will immediately investigate whether the 5,445 customers who "failed" their TPV "re-examination" and had their accounts cancelled are entitled to prompt refunds. There is a great risk that these customers have been defrauded. Now that defendants' monthly charges have been removed from their telephone bills, these customers are less likely to discover that they were fraudulently billed.